STATE of Missouri, Respondent,

v.

Alfred WASHINGTON, Appellant.

No. 49100.

Supreme Court of Missouri,

Division No. 2.

June 4, 1963.

William C. Schock, St. Louis, for appellant.

Thomas F. Eagleton, Atty. Gen., Scott O. Wright, Sp. Asst. Atty. Gen., Jefferson City, for respondent.

LEEDY, Judge.

Alfred (Romeo) Washington was convicted of murder in the second degree in having killed Augusta Shepherd in the City of St. Louis on October 7, 1960, by striking, knocking, hitting and beating her with his fists with great force and violence. Punishment was fixed by the trial judge (upon finding that defendant had been convicted and sentenced for two prior felonies, as alleged in the information) at thirty years' imprisonment. Sentence and judgment went accordingly, and this appeal followed.

The motion for new trial contained four assignments, one of which has not been briefed on this appeal, and, therefore, has been abandoned. Another, the first, is that "The verdict is against the law, against the evidence, and against the

weight of the evidence." It should no longer be necessary to cite cases holding this assignment wholly insufficient (for want of particularity under Rule 27.20 V.A.M.R.) to preserve anything for appellate review; but among the cases so holding are State v. Summers (Mo.), 362 S.W. 2d 537, 540; State v. Roberts (Mo.), 332 S.W.2d 896, 898; State v. Daegele (Mo.), 302 S.W.2d 20, 22; State v. Schramm (Mo.), 275 S.W.2d 343. The two other grounds of the motion for new trial respectively complain of admitting in evidence certain photographs, and of the form of the manslaughter instruction (No. 3).

Defendant's brief concedes the sufficiency of the evidence to make a case for the jury on the issue of manslaughter, and then, under the guise of arguing ground one of his motion for new trial (held insufficient), treats said ground as having embraced and charged error "in accepting a verdict of second degree murder from the jury, for the reason that the evidence was insufficient * * * [to prove the elements of deliberation and malice which are necessary to constitute murder in the second degree]." If sustainable under the record, this would have constituted plain error affecting a substantial right of defendant (the maximum punishment for manslaughter being ten years, whereas he has been sentenced to thirty for second degree murder), and hence might be considered under Rule 27.20(c), in the discretion of the court, even though not raised in the trial court, nor preserved for review. That rule has not been invoked, but we may say in passing that failure so to do will have worked no harm or prejudice in this instance because the record not only does not support the assignment, but, on the contrary, negates it. The facts clearly warranted the submission of the hypothesis of second degree murder, as will appear from our outline of those facts necessary to an understanding of the points hereinafter considered. They are sordid and revolting in the extreme.

Defendant, aged 25 at the time of trial, is colored, as was the deceased, Augusta (referred to in the record as "Gussie," and we shall so designate her), who was apparently a prostitute. She lived (presumably in a single room) on the second floor of a crowded, dilapidated old tenement house at 1831 Franklin Avenue in the City of St. Louis. At the rear of the building was an area called a courtyard. Access to the structure could be gained either through the entrance fronting on Franklin Avenue, or by going down an alley, then passing through a gangway into the courtyard and entering from the rear. In going to Gussie's room by the latter route, one would ascend the outdoor stairway to the upstairs porch, and thence along the porch to the door to the hall leading to Gussie's room.

Pearlie May Trotter lived at the same address, but in the rear; that is, across the courtyard from, and opposite Gussie's place of abode. She testified that about 2:30 on the afternoon in question, she was "in her front window looking out" when she "seed Miss Gussie Shepherd and Romeo come through the alley," and go through the gangway, and up the steps and to Gussie's door, "but they didn't go in the house." Witness then left the window, and went to her porch. She testified that at this juncture "they was wrestling, and he hit her four or five times standing up, and then he knocked her down, and when he knocked her down he kept beating her—hit her four or five times—and he pulled down his pants and underwear, then got down on her * * * he tore her panties off, and he got on her, and he was still beating her, and she was hollering, 'Johnny, come help me.'" He also hit her four or five times as she was trying to get up. He continued to have or attempt to have intercourse with her for "maybe five or ten minutes or longer, * * * then he got up off her and drug her in the house * * * by the arm." He entered the doorway where Gussie lived, and witness saw them go to Gussie's room. While defendant was beating Gussie, the witness called the police, and also awakened

her friend and guest, Marie Ivory, who came to the porch at once. The police arrived, but in the meantime another affray had broken out, a man and wife fighting in the alley, and the police directed their attention to this disturbance, and when told by Pearlie May of the real subject of the call, said they didn't have time to attend to it, and she put in another call for the police, but there was a twenty-five or thirty minute delay in their arrival. Meanwhile, defendant, who had remained inside until shortly before the police arrived, came out and left the premises. As he was leaving "there was men in the gangway gambling, and he said to them they haven't seed anything and don't know nothing." The witness did not know any of these men in the gangway. As he left, defendant "had his [corduroy] coat tied around in front of him," and was wearing a white shirt, khaki pants and "had blood on his clothes." Witness had been acquainted with defendant a year and a half or two years.

Marie Ivory was also called by the state, and in general her testimony followed very closely and corroborated that of Pearlie May. For this reason, we do not restate its purport, except to say that Marie was somewhat more specific in describing the delivery of some of the blows; that is, that defendant struck deceased on the left side of the face at least three times, and this seemed to render her unconscious.

When the police came, they went upstairs and "found the door open, and on looking in observed the body of a woman partially nude and apparently dead. She was lying across the bed on her back with her legs apart and her clothing ripped off of her, and quite a bit of blood. The bed was splattered with blood and blood around on the floor."

The autopsy disclosed the following with respect to the condition of Gussie's body and the cause of her death: That she had a contused wound at the temporal side of the right eye, a contused wound with a large hematoma involving the left side of the face and left side of the neck, a puncture wound on the left forearm, lateral side contusion over the twelfth rib on the left side of the chest, midaxillary line and contusions of forehead, left; her scalp showed extensive hemorrhage under the galia on the left side; the brain was congested, spine and spinal cord showed fractures, dislocation of the atlas onto axis with hemorrhage into spinal canal; a sub-pleural hemorrhage and fracture of the twelfth rib on the left side of the chest; the cause of death was fracture dislocation of the spine with hemorrhage into the spinal canal. The pathologist gave it as his opinion that death from such an injury would have resulted "anywhere from fifteen to thirty minutes," and that from the type of contusions found on Gussie's body, her fatal injury could have been caused by blows from the fist.

Defendant's version of the facts differs widely from that of the state. In substance, his testimony was to this effect: That he and Gussie had been drinking in a nearby bar or tavern, and that he there gave her $3.00 for which she agreed to engage in sexual intercourse with him, and it was in pursuance of that agreement that they proceeded from the tavern to the Franklin Avenue address together; that (as recited in his brief) "they proceeded up to the hallway of her flat, where an argument took place. Apparently, the adjoining room she had intended to use for the act of prostitution was busy with another party, and an argument took place concerning the refund of the $3.00. When the deceased refused to return the money, there was a struggle in the hallway and [an] act of intercourse ['with her consent']; * * * he had not hurt the deceased in any manner during this phase of the happenings [although he admitted hitting her three or four times when in the hall, but these, he insisted, 'were not with the fist, but just slaps']; * * * that the struggle was of a minor nature, and it took place in the hallway and not on the porch; * * * that the important phase of the afternoon's events

# 443

took place inside the bedroom; * * * that he was lying on the bed resting when he was attacked by the deceased with a metal object * * * and stabbed above the eyes on his forehead. He got up immediately and defended himself" by hitting her a couple of times, and she fell back against the bed, then got up—"she was sort of dazed"—and he "hit her a couple of times more," and she got up again. He testified he then "tapped her around a couple of times, and she was kicking and biting, and I hit her harder on the side of the head, and when I hit her the last time she fell across the bed." His testimony then proceeded in this fashion:

"Q How many times after the second time she got up did you hit her? A About six times.

"Q With what force did you hit her? A I would say three were good solid blows. * * * And when I hit her the last time she fell across the bed, and I figured I knocked her out, and I left her lay there, and I got my clothes and put them on and left. * * *

"Q Was she alive? A I can't say whether she was alive or dead, but she looked to be breathing.

"Q How much blood was on her person? A From the mouth and in the nose, I would say not too much, not really bloody."

Asked why he didn't get help for Gussie, he replied, "I didn't think she was really hurt. I just thought I knocked her out, and she would be all right." Then followed this question and answer:

"Q Had you realized you lost your temper? A No, I wouldn't say I stopped to analyze that or figure it out."

After leaving the premises, he changed his clothes (which had bloodstains on them), went out Broadway to the Chain of Rocks bridge and hitchhiked a ride to Chicago. From there he went to Arizona, where he was apprehended in the latter part of the following December and returned to St. Louis.

The pathologist to the coroner further testified that in his examination of the body he found several of the upper teeth had been knocked out, and that this had been done recently, the other teeth appearing to be normal (no dentures). The police found a tooth and two pieces of a broken hair comb in the hallway; they found a gold-capped tooth on the porch, and two teeth were found on the bed.

■■ Point II of defendant's brief complains that the "court committed error in not sustaining defendant's objection to the introduction in evidence of certain photographs of the body of deceased * * * [for reasons now belatedly specified for the first time]." The only objection interposed at the trial to the offer of such photographs was by defendant's counsel in these words: "I object strenuously to introduction of these photographs." This constituted no objection at all, and the court was justified in overruling it because of its generality and failure to specify any reason. Accordingly, the defendant is not entitled to complain of their gruesomeness on this appeal. Such a complaint was not even made on motion for new trial or otherwise suggested to the trial court, much less when that court was called upon to rule on the admissibility of the photographs, i. e., when offered. But apart from this, there would have been no error in so ruling even if the objection now urged had been timely made. The photographs depict the scene of the homicide as found by the police, the semi-nude body of deceased lying, face up, on the bed with large quantities of blood on her face, arms and body and on the mattress underneath, her mouth and lips obviously swollen. The matters and things thus shown are indicative of the severity of the battery committed upon Gussie's person, and, to a marked degree, the intent with which it was committed, and the extent thereof, thereby completely negating (when considered in conjunction with the

other facts and circumstances hereinabove detailed) defendant's claim of want of evidence of premeditation for the submission of the hypothesis of second degree murder.

In addition to instructions on murder in the first degree and murder in the second degree (as well as on self-defense), the court also gave instruction No. 3 covering the subject of manslaughter, reading as follows:

"If you find the defendant not guilty of murder in the first degree and not guilty of murder in the second degree, as explained in the foregoing instructions, then you will consider whether or not, under the evidence in the case, the defendant is guilty of manslaughter.

"Manslaughter is the killing of a human being not herein declared to be murder in the first or second degree, or excusable or justifiable homicide, and the Court instructs you that if you find and believe from the evidence, beyond a reasonable doubt, that the defendant, Alfred Washington, at the City of St. Louis and State of Missouri on the 7th day of October, 1960, with his fists, intentionally struck, knocked, hit and beat one Augusta Shepherd, without malice and without premeditation, as those terms are hereinbefore explained, and under such circumstances that it is not justifiable or excusable homicide, and not in the lawful defense of his person, as defined in another instruction, and if you further find that said Augusta Shepherd died from the effects of such divers wounds, cuts, bruises, abrasions and contusions, then you will find the defendant guilty of manslaughter, and unless you so find the facts to be, you will acquit the defendant of manslaughter.

" 'Excusable homicide' as used in these instructions, means the accidental killing of another.

" 'Justifiable homicide' as used in these instructions, means the killing of another in the lawful defense of one's person, as more fully explained in another instruction given you."

 The complaint directed against this instruction is that it "failed to define manslaughter perpetrated by the defendant while in the heat of passion upon lawful provocation." We take it that by the use of the words "failed to define" defendant means failed to submit facts hypothesizing a heat of passion situation, and not failure to define the words "heat of passion." If so, under his own testimony defendant was not entitled to such hypothesization, this because he did not claim he acted in the heat of passion, as the last quoted question and answer from his testimony conclusively demonstrates. Nor were the facts as a whole of such nature as to require that hypothesization as a part of the law of the case under Rule 26.02(6) whether requested or not.

We have examined those portions of the record required by Rule 28.02, and find no reversible error therein. The judgment is, therefore, affirmed.

All of the Judges concur.