STATE of Missouri, Respondent,

v.

Bruce CUMMINGS, Appellant.

No. 61446.

Supreme Court of Missouri,
Division No. 1.

Nov. 12, 1980.

John K. Greider, Clayton, for appellant.

Steven W. Garrett, Asst. Atty. Gen., Jefferson City, for respondent.

WELBORN, Commissioner.

Appeal from judgment of conviction, on jury verdict, for second degree murder and sentence, imposed under second offender act, to life imprisonment.

On August 27, 1977, Anginetta Mitchell, two years and two months of age, was admitted to St. Louis Children's Hospital with third degree scalding water burns over 40 to 45% of her body. She remained hospitalized until October 4, 1977, when she died

from pneumonia and sepsis resulting from her burns.

On July 31, 1978, an information was filed charging Bruce Dwight Cummings with manslaughter in the death of Anginetta. He was subsequently indicted by a grand jury for second degree murder. Prior to trial, an information in lieu of indictment, which included a charge of a prior felony conviction and again charged Cummings with second degree murder, was filed.

At appellant's trial in August, 1979, the state's evidence was substantially as follows:

Babette Williams testified that, in August, 1977, she and her sister occupied a first floor apartment at 2712 Belt Avenue in the City of St. Louis. A second floor apartment was occupied by Antoinette Mitchell, her daughter Anginetta and appellant. At around 7:00 A.M., on August 27, 1977, she heard noises from the upstairs apartment, "like a bumping on the floor" and "every time I heard a noise on the floor I heard a baby crying. * * * I heard a baby cry real loud and then Bruce came to the top of the steps, called my little sister * * * and I asked him could I help him and he said the baby had got burned." Babette ran up the stairs and saw Bruce holding the baby, wearing a tee–shirt and a Pamper, under her armpits. Babette saw that the child had been burned on her legs and the skin there was peeling. Bruce laid the baby on a bed and Babette went next door and called an ambulance.

Babette said that, when she returned, Bruce told her that he was boiling water to wash some clothes and the baby had poured the hot water off the stove on herself. Babette looked in the kitchen. She saw a pot on the stove but no water on the floor. She also saw a pot in the bathroom.

Bruce asked Babette to take the child to the hospital and she insisted that he accompany them. The two of them went to the emergency room of the Children's Hospital with the baby.

The witness was asked whether she heard a discussion "a short time after that." She said: "Yeah, about a couple of days ago, you know, they was talking loud upstairs." She heard Bruce say: "If you want to blame me hurting the baby go ahead say I hurt her, but I accidentally put the baby in the bathtub of hot water."

Bridgette Williams, Babette's sister, testified that Annette, Bruce and a little girl lived in the upstairs apartment. She did not know their last names. At the time of the incident in question, she heard her sister running down the steps and screaming. As Babette went next door, Bridgette went upstairs and saw the baby "laying on the bed wrapped up in a sheet." She saw a pot sitting on the stove in the kitchen but saw no water on the kitchen floor.

Dr. Janet Endress was the chief doctor in the emergency room at St. Louis Children's Hospital when Anginetta arrived there at 7:40 A.M., August 27, 1977. The adults accompanying the child told Doctor Endress that " * * * there was water boiling on the stove and while everyone was out of the room father says he heard the girl scream and found her with legs up sitting in boiling water on the floor." The appellant identified himself as the child's stepfather and legal guardian. The doctor found "scalding of both legs, peeling skin over abdomen (slight), over both buttocks, involving both feet." There were no burns on the hands. She estimated a 40 to 45% burn and the absence of sensation in the burned areas led her to classify the injury as third degree burns.

The child's condition was stable at first but on September 26, she developed sepsis. She later developed pneumonia and died on October 4.

Dr. Faye Spruill, Deputy Chief Medical Examiner for the City of St. Louis, testified that she performed an autopsy on the body of the child from which she concluded that death was the result of pneumonia and sepsis due to body burns. She testified that, in her opinion, " * * * the pattern of the burn is such that the child is submerged in these areas and is not self–inflicted * *."

"It's my opinion that because of the pattern of burn that is all the way around both legs on the front and the back, the sides, that it would not be possible to pull a hot liquid onto all of these surfaces in such a fashion as to cause the depth and pattern of injuries so in my opinion it would not be possible to receive this type of burn from pulling water over onto oneself."

She stated that the pattern of the burns, involving small patchy areas around the ankles where the skin was still relatively normal, was not compatible with the child's crawling into a tub of hot water. She found no evidence of third degree burns on the child's hands.

A police officer who was called to the apartment on Belt testified that he went to Children's Hospital where he questioned appellant about the incident. Appellant told the officer " * * * that he was * * * heating some water to prepare breakfast in the kitchen and that he had left the room to straighten furniture in the front part of the apartment and while he was in the front part of the apartment he heard this child scream out and he went in there and seen that she had pulled the pot off the stove." The officer classified the incident as an accidental injury.

The defendant and his sister, Yvonne Cummings, testified for the defendant. According to Yvonne, appellant came to her house at around 2:30 or 3:00 A.M. on the morning of August 27. He stayed there until around 7:30 or 7:45, when she, at her brother's direction, drove him to an address on Belt. She did not remember the address and said that, when they arrived there, a young lady was standing out front and that "she was beckoning for him to come here quick." Bruce got out of the car and Yvonne left. Later Bruce called her and told her that the baby had been scalded and they were going to take her to the hospital.

Appellant denied that he was present when the child was injured. According to him, his sister drove him to the Mitchell apartment and when they got there, Babette (Cookie) Williams was standing in the doorway, beckoning for him to come there.

He did so and they ran upstairs to the second floor and he saw the child on a bed with a sheet across her. According to him, Babette had been babysitting with the child. When the ambulance arrived, he said that he was the child's stepfather " * * * on technicality hoping that I could probably get the child hospitalized immediately without out no strings attached." He said that, at the hospital emergency room, he told the doctor " * * * what had been explained to me, that some water fell on the child and that I was babysitting the child rather than anybody else." He testified that he visited her almost every day in the hospital and was there when she died.

The jury was instructed on second degree murder and manslaughter and returned a verdict of guilty of the former. The court, acting under the second offender act, fixed punishment at life imprisonment. After the defendant's motion for new trial had been overruled, judgment and sentence were pronounced accordingly.

In this Court, appellant's first assignment of error is based upon the admission into evidence and displaying to the jury of two photographs of the child. The Williams sisters identified the photographs as of Anginetta. Doctor Endress identified them as pictures of the child, but stated that the pictures were "much later" than the date of her admission to the hospital. The medical examiner also identified the pictures as those of the child. Although the transcript does not so show, both parties here assert that the photographs in question were taken after the child's death.

The defendant objected to the introduction of the photographs into evidence and their being shown to the jury for the reason that they were highly inflammatory and prejudicial because they showed the mutilated body of the victim and the defense offered to stipulate to whatever the pictures would show, and further that the photographs were irrelevant and immaterial because they were taken 39 days after the incident and there was no testimony that they represented what the victim looked like at the time of the occurrence.

That objection is the basis of the assignment of error here.

■ However, the question is not whether the photographs were gruesome and prejudicial but whether or not they threw any relevant light upon a material matter at issue. *State v. Moore*, 303 S.W.2d 60, 66[3] (Mo. banc 1957). The fact that oral testimony had described the facts portrayed by a photograph is no reason to reject the demonstrative evidence. *State v. Jackson*, 499 S.W.2d 467, 472[5–8] (Mo.1973).

■ This case involved an unusual type of injury in a homicide. The nature and extent of the burns sustained by the victim were a crucial part of the state's case. The admitting physician testified that the pictures were "consistent with" the condition of the burns which she observed on the admission to the hospital, although the picture was "much later." Doctor Spruill based her opinion that the burns had not been self–inflicted upon their location. The photographs were supportive of this opinion, demonstrating graphically the facts upon which the opinion of the medical examiner was based. Although the pictures were taken sometime after the incident, they did show the nature and extent of the burns suffered by the child and the trial court did not abuse its discretion in permitting them to be exhibited to the jury.

Appellant next contends that the trial court erred in finding that the second offender act was applicable because the prior conviction relied upon for that purpose was a federal court conviction for bank robbery and he had been sentenced, on his plea of guilty, under the Federal Youth Corrections Act. 18 U.S.C. §§ 5005–5026. At trial, the defendant's objection was that a sentence under the Youth Corrections Act was similar to a juvenile conviction under Missouri law and should not have been used to invoke the second offender act and "as a juvenile conviction should have been sealed and made confidential and not available for use." That ground has been reasserted in appellant's point here but it is not argued. Instead, the contention here argued is that sentencing under the Youth Corrections Act

is comparable to a suspended imposition of sentence in Missouri practice and does not amount to a conviction under the second offender law.

■ The argument here advanced, not having been the basis of the objection stated at the trial and in the motion for new trial, cannot be raised for the first time in this court. *State v. Jones*, 515 S.W.2d 504, 506[3, 4] (Mo.1974).

■ In any event, a conviction and sentencing under the Youth Corrections Act is a conviction for a crime. *United States v. Ashley*, 569 F.2d 975, 978[1, 2] (5th Cir. 1978); *United States v. Canniff*, 521 F.2d 565, 569 n. 2 (2d Cir. 1975). There has been no showing that the appellant was entitled to or received the benefit of expungement of his sentence under 18 U.S.C. § 5021. Therefore, there was no error in the use of the conviction in this case as the basis for a finding that appellant was subject to the second offender act. See *State v. Pacheco*, 121 Ariz. 88, 588 P.2d 830, 832–833[5–7] (1978).

■ Appellant assigns as error the overruling of his motion for a directed verdict at the close of the state's case and at the close of all of the evidence. However, his contention is premised on the theory that the evidence showed that if any crime was committed it was manslaughter rather than murder in the second degree. Obviously, if the evidence was sufficient to prove manslaughter, there could have been no error in overruling motions for directed verdict because, in any event, that offense, included in the second degree murder charge, was submissible to the jury.

Insofar as the complaint is considered as one directed to the sufficiency of the evidence to support the finding of guilt of murder in the second degree, the circumstances relied upon by the state were sufficient to permit the jury to find that, without justification or excuse, appellant intentionally immersed the victim in scalding water, an act calculated to cause serious injury, and death resulted from such act.

The necessary elements of murder in the second degree would be supplied by such finding. *State v. Jackson*, 496 S.W.2d 1, 2[1] (Mo. banc 1973); *State v. Washington*, 368 S.W.2d 439, 443–444[5–7] (Mo.1963).

■ Appellant complains that the trial court improperly limited his voir dire examination. In defense counsel's voir dire, he stated that he wished to inquire of the panelists about some legal principles. The trial court instructed him not to go over them, stating that he had read the required instructions (MAI–CR 2d 2.20) and the prosecutor had gone into them (The prosecutor had inquired whether or not anyone would hold the state to a higher burden of proof than beyond a reasonable doubt.). The court then again told the jury of the presumption of innocence and of the burden of proof and inquired whether or not anyone could not follow those principles. When the court informed defense counsel that no further inquiry along those lines was necessary, defense counsel stated that he wanted to go into the burden of proof and the fact that a charge had been filed was no evidence of guilt. He also stated that he wanted to go into the difference in burden of proof in criminal and civil cases. The court permitted inquiry along the latter lines. Defense counsel objected to the limitations upon his voir dire. By his motion for new trial and in this Court, the claim of error is premised upon the fact that no such limitation was imposed upon the prosecution, that the court erroneously prevented inquiry regarding the legal principles involved, and that the court's ruling prevented defense counsel's asking questions which might have tended to inform the jury of the nature of the case and the defendant's defense.

In this Court, appellant acknowledges the discretion which the trial judge has with respect to voir dire and he states the general proposition that a liberal latitude should be allowed in the examination of the panel. His only specific complaint is stated as follows:

"The legal terms 'reasonable doubt' and 'presumption of innocence' are technical terms and have specific definitions. However, the attorney for defendant was prevented from asking the jury if they understood the difference between preponderance of the evidence and reasonable doubt, (Supp. Tr. p. 76). Defendant contends that this prevented him from determining whether any members of the jury panel understood the term 'reasonable doubt,' thereby preventing him from knowledge that would aid him greatly in making any challenges for cause or preemptory challenges."

The trial court did correct defense counsel when he referred to the burden of proof in civil cases as being the "preponderance of the evidence." However, counsel was permitted to inquire whether or not the panelists understood that a "much higher standard of proof" was required in criminal cases. The trial court reasonably excluded reference to "preponderance of the evidence" because, as he stated, the jurors might be called to sit in civil cases and that would not be the burden of proof language in such cases.

*State v. Lumsden*, 589 S.W.2d 226, 228–229[6, 7]–[9] (Mo. banc 1979) answers any complaint based upon limitation of inquiries regarding "reasonable doubt." The presumption of innocence was explained twice by the court in its preliminary instruction and again in the court's inquiry to the jury.

The trial court's rulings regarding the voir dire were within the proper scope of the discretion accorded him and provide no basis for finding of error.

Judgment affirmed.

PER CURIAM:

The foregoing opinion by WELBORN, C., is adopted as the opinion of the court.

All of the Judges concur.