**STATE of Missouri, Respondent,**

v.

**Richard Dean McMILLIN, Appellant.**

No. 70502.

Supreme Court of Missouri,
En Banc.

Jan. 10, 1990.

As Modified on Denial of Rehearing
Feb. 13, 1990.

Melinda K. Pendergraph, Columbia, for appellant.

William L. Webster, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for respondent.

COVINGTON, Judge.

Richard Dean McMillin was convicted by a jury of murder in the first degree. § 565.020.1, RSMo 1986.[1] The trial judge fixed punishment at death. The judgment is affirmed.

Appellant presents twenty-two points on appeal, many containing numerous sub-points. Some points and sub-points were preserved. Appellant seeks plain error review under *Rule 30.20* of the substantial remainder.

## I. THE CASE

The evidence before the jury showed that defendant was employed as a maintenance worker at St. John's Fitness Center in Springfield, Missouri. He lived in an apartment in Springfield with his sister, Marlene McMillin. Thomas Hawn, a friend of McMillin's, lived across the hall. Other friends of McMillin, Jerri Pendergrass and her boyfriend Bryan Nickle, lived across the street.

In March of 1987, Jerri Pendergrass telephoned her cousin, Kenny Pendergrass, from McMillin's apartment to obtain a gram of "crystal," a street name for methamphetamine, a Schedule II controlled substance. § 195.017.4. Kenny responded that he knew a woman who could obtain crystal. After borrowing $100.00 from Marlene McMillin, Jerri Pendergrass, Bryan Nickle and Richard McMillin drove to Kenny's residence where they met the murder victim, Jennifer Renee Scurlock. The parties agreed that Renee would take the money from Jerri, leave the house to purchase the crystal, and return with drugs or the money in approximately two hours. Renee Scurlock did not return. Jerri repaid the $100.00 to Marlene McMillin but was unsuccessful in her repeated attempts to retrieve the money from Renee Scurlock.

---

1. All statutory references herein are to RSMo 1986 unless otherwise stated.

Throughout March and early April, Richard McMillin spoke to several individuals about a woman who owed him money, and McMillin told his sister and Nickle that he was tired of being "ripped off" and of "people messing him around on drug deals." McMillin also asked his friend and business partner, Easley Van Mitchell, to assist in obtaining a handgun. Mitchell first agreed but later told McMillin that he was unable to secure a handgun.

Early on Sunday evening, April 12, 1987, McMillin was at his apartment with Mitchell and Hawn, drinking and playing backgammon. McMillin made a telephone call, after which he told the others that he had "found out the f——ing bitch's phone number" from Jerri Pendergrass and that he was going to call Renee Scurlock. McMillin then made a second call, after which he told Mitchell and Hawn that he was going to meet Renee Scurlock at the corner of Glenstone and Sunshine streets. Before he left, McMillin asked Mitchell where he could find some cord that could not be traced. Mitchell replied that he thought he had some at his office. Approximately fifteen minutes after McMillin left, Mitchell and Hawn drove to Mitchell's office, collected a length of cord, then went to the intersection of Glenstone and Sunshine where they observed McMillin talking to a young woman in a brown Ford LTD. McMillin and the woman then drove to McMillin's apartment complex in their respective cars. Mitchell and Hawn returned to McMillin's apartment complex where they saw the brown LTD and McMillin's car parked on the street. Hawn went to his apartment, and Mitchell went to McMillin's.

McMillin had taken Renee Scurlock to Jerri Pendergrass' apartment. McMillin had in his possession a gun belonging to Jerri's father which McMillin had obtained shortly before meeting Renee Scurlock. Renee's face was cut and swollen.

Jerri Pendergrass and Bryan Nickle were in the apartment along with Jerri's cousin Linda Pendergrass and her boyfriend, John McHaffie. McMillin and Jerri demanded that Scurlock either return the money or obtain the crystal. Renee offered to leave and get the money, but McMillin refused to allow her to go, saying she would disappear just as she had done before. McMillin also rejected the suggestion that he take some personal property of Renee Scurlock's to compensate for the money she had kept. Jerri then told Linda and McHaffie to go into the bathroom and remain there because they "wouldn't want to know" what might happen.

McMillin ordered Renee Scurlock to lie down on the floor and told Bryan Nickle to go across the street to get from Mitchell the rope and a cloth to use as a gag. McMillin also requested Bryan Nickle to contact Tommy Hawn and tell Hawn that he was to follow in McMillin's car when McMillin departed in a few minutes. He further instructed Bryan Nickle to tell Hawn to purchase some gasoline on the way. Mitchell appeared at Jerri's apartment with a rope and some cloth which McMillin used to bind and gag Renee. McMillin then took Renee outside. After putting her in the passenger seat of her car, McMillin drove away. Hawn followed. McMillin and Hawn drove toward the outskirts of Springfield. On the way Hawn stopped and filled a gallon container with gasoline while McMillin waited two blocks ahead. Outside Springfield, McMillin and Hawn drove south on Highway 22, west on a farm road, and then turned into a gravel driveway in a field near Republic, Missouri. McMillin drove Renee Scurlock's car approximately fifty feet into the driveway while Hawn parked McMillin's vehicle by the side of the road.

After parking the vehicle, McMillin struck Renee Scurlock repeatedly about her face and head with the butt of his pistol. When Renee failed to lose consciousness, McMillin poured gasoline on her from the container Hawn had filled and attempted to ignite her with a cigarette lighter. Renee Scurlock, still bound and burning, escaped through the passenger door and attempted to run across the field, jumping up and down in an effort to extinguish the flames. McMillin got out of the vehicle and shot Renee Scurlock twice in the back.

The autopsy revealed that one bullet had penetrated Renee's heart, causing her to bleed to death. Hemorrhaging had occurred in the scalp area indicating the head wounds occurred prior to death. Over fifty percent of Renee Scurlock's body suffered second and third degree burns. Examination of the esophagus and trachea showed evidence that burning materials had been inhaled. The physician who performed the autopsy concluded from the presence of soot deposits in the trachea that Renee Scurlock had been in close proximity to a fire while she was still breathing.

After shooting Renee, McMillin went through Renee's purse. He poured gasoline inside the automobile in an attempt to destroy it. McMillin then got into his own car with Hawn and they returned to Springfield. When they reached the apartment complex, McMillin described the murder to Hawn, Mitchell, Nickle and Jerri. He commented on the blood spattered on his shoes and talked about disposing of the gun.

The evidence supports the jury's verdict on guilt.

In the penalty phase of the trial, the state introduced evidence of McMillin's court-martial conviction of possession of hashish with intent to distribute, and of the consequent bad conduct discharge from the United States Army. McMillin presented witnesses in mitigation including his mother, a former Army supervisor, a former high school teacher, and other friends and co-workers. McMillin himself testified. The jury returned a form of verdict stating that it was unable to agree on punishment. As provided under § 565.030.4(4), the trial judge entered judgment. The court imposed a sentence of death, finding that the evidence established as statutory aggravating circumstances that the murder of Renee Scurlock was outrageously or wantonly vile, horrible or inhuman in that it involved torture or depravity of mind, § 565.032.2(7), that the murder was committed while McMillin was engaged in the perpetration of kidnapping, § 565.032.2(11), and that the murder was committed while McMillin was attempting to perpetrate the felony offense of a sale of methamphetamine, § 565.032.2(11).

## II. DISMISSAL OF RULE 29.15 MOTION

In the sentencing proceeding, the trial court advised the defendant that he had the right to file a motion to vacate and set aside or correct his conviction or sentencing under *Rule 29.15*, summarized the claims available under the Rule, and informed the defendant of the time constraints contained in the Rule. In response to the trial court's subsequent questions, McMillin stated that he had no complaints about his defense attorneys, that his counsel had done everything he had asked them to do and were "[v]ery fine lawyers." Six months later, on November 15, 1988, McMillin filed a signed and verified motion under *Rule 29.15* in which he raised a single claim: that trial counsel should have objected when, during the penalty-phase, the prosecutor described McMillin's court-martial conviction as a felony. The court appointed counsel to represent movant on December 5, 1988.

On December 30, 1988, the court granted counsel's request for an extension of time to file an amended motion.

On January 5, 1989, McMillin filed a *pro se* affidavit, with copies to the prosecutor and McMillin's appointed counsel, which asked the court to dismiss his *Rule 29.15* motion: "(1) Movant states that he is withdrawing his motion 29.15. (2) Movant further states, all past, present and future appeals are hereby dropped. (3) Movant hereby states that all decisions made and stated herein are both voluntary and knowledgable decisions."

Twelve days later, on January 17, 1989, McMillin's counsel filed an "amended motion under Rule 29.15" alleging in excess of 230 grounds of ineffective assistance of counsel and other constitutional deprivations. The pleading did not contain appellant's signature and was not verified as required under *Rule 29.15(d)*. The "amended motion" made no reference to McMillin's *pro se* affidavit of January 5, 1989.

Two weeks later, on January 31, 1989, counsel filed a motion for mental examination which, for the first time, acknowledged existence of McMillin's affidavit. Counsel alleged that McMillin's supposed history of head injury and drug or alcohol abuse, in addition to his confinement in prison, rendered McMillin "incompetent" and suggested that McMillin's request to dismiss his *Rule 29.15* motion was evidence of incompetency. On February 14, 1989, the circuit court stated its intent to dismiss McMillin's *Rule 29.15* motion in accordance with his request unless prohibited by extraordinary writ. Appellate courts twice denied requests for extraordinary writs after which the trial court dismissed McMillin's *Rule 29.15* motion, referencing *Rule 67.01*.

■ Seizing upon the trial court's reference to *Rule 67.01*, McMillin's counsel argues that the trial court erred in dismissing McMillin's *Rule 29.15* motion at McMillin's request because the civil rule on voluntary dismissals without prejudice does not apply to post-conviction proceedings. Although counsel does not so acknowledge, counsel actually seeks to avoid application of *Rule 29.15(k)*, which prohibits the trial court from entertaining successive post-conviction relief motions, by requesting reinstatement of McMillin's *pro se* motion so as then to proceed on counsel's amended motion.

Notably, nothing in the record before this Court reflects that Mr. McMillin himself has chosen to deviate from his intentions as stated on January 5, 1989, in his motion to withdraw his *Rule 29.15* motion.

■ Assuming, *arguendo*, that counsel speaks for appellant on appeal, counsel errs in reliance on the trial court's reference to *Rule 67.01*. *Rule 67.01* conflicts with the clear policy expressed in *Rule 29.15(k)* and does not apply in a *Rule 29.15* proceeding. Counsel may not avoid the clear prohibition against successive motions stated in *Rule 29.15(k)* by seeking reinstatement of McMillin's *29.15* motion. The trial court did not err in dismissing McMillin's *Rule 29.15* motion.

■ Perhaps tacitly acknowledging the futility of the first argument under this section, counsel also asserts that the lower court erred in denying counsel's motion for mental evaluation. Counsel cites *Rees v. Peyton*, 384 U.S. 312, 86 S.Ct. 1505, 16 L.Ed.2d 583 (1966), in support of the contention that the court has an obligation to determine whether McMillin's waiver of *Rule 29.15* relief was knowing, voluntary and intelligent. Counsel purported to have filed the motion for mental evaluation pursuant to Chapter 552. A Chapter 552 psychiatric evaluation, however, cannot be ordered after the defendant is sentenced. *Shaw v. State*, 686 S.W.2d 513, 514 (Mo. App.1985); *Brown v. State*, 485 S.W.2d 424, 428 (Mo.1972), *rev'd on other grounds, Schellert v. State*, 569 S.W.2d 735, 740 (Mo. banc 1978).

■ Attempting to circumvent *Shaw*, counsel then asserts error in the motion court's failure to conduct a hearing to establish the defendant's capacity to appreciate his position and make a rational choice. Arguing without citation, counsel suggests that the court could have ordered a psychiatric evaluation of appellant if the court had some reason to believe that McMillin lacked mental fitness to proceed, apparently pursuant to § 552.020.2. As purported evidence of McMillin's alleged lack of mental fitness to proceed, counsel points to McMillin's history of alleged serious head injury and drug and alcohol abuse, the lack of a complete and thorough evaluation of McMillin prior to trial, McMillin's confinement in the restrictive environment of death row, and McMillin's act of dismissing his *Rule 29.15* motion. Counsel's argument fails. McMillin was examined and found to have the mental capacity to stand trial. Furthermore, defense counsel relied upon the evaluation prior to trial. Apart from conclusory statements, counsel presents no new evidence through which the judge would have had reasonable cause to believe that McMillin lacked mental fitness to proceed. The theory that anyone under sentence of death who desires not to pursue every possible remedy is "incompetent" to make that decision was refuted in *Gilmore v. Utah*, 429 U.S. 1012, 1013, 97 S.Ct. 436, 437, 50 L.Ed.2d 632 (1976). Even assuming, *arguendo*, that the court below

could have ordered a psychiatric evaluation of McMillin, the court had no grounds upon which to grant counsel's motion for mental examination absent any reasonable basis to believe that McMillin was incapacitated.

The trial court did not err in dismissing McMillin's *Rule 29.15* motion.

### III. VOIR DIRE ISSUES

Appellant devotes several points on appeal, only some of which were preserved, to various contentions that the *voir dire* was wrongfully conducted. A number of the points raise contentions related to the "death-qualification" phase of *voir dire,* and all, explicitly or implicitly, claim violation of appellant's right to a fair and impartial jury pursuant to the Sixth and Fourteenth Amendments to the United States Constitution.

Established principles apply to the analysis of numerous of appellant's challenges. The Sixth and Fourteenth Amendments to the United States Constitution guaranteeing an impartial jury prohibit the exclusion of veniremembers "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Gray v. Mississippi,* 481 U.S. 648, 657, 107 S.Ct. 2045, 2051, 95 L.Ed.2d 622 (1987), *quoting, Witherspoon v. Illinois,* 391 U.S. 510, 522, 88 S.Ct. 1770, 1777, 20 L.Ed.2d 776 (1968). Only those jurors "irrevocably committed, . . . to vote against the death penalty regardless of the facts and circumstances that might emerge in the course of the proceedings" are properly excluded from the panel. *Gray,* 481 U.S. at 657–58, 107 S.Ct. at 2051–52, *quoting, Witherspoon,* 391 U.S. at 522 n. 21, 88 S.Ct. at 1777 n. 21. The proper standard for determining when a prospective juror may be excluded for cause because of his or her views on the death penalty is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt,* 469 U.S. 412, 420, 105 S.Ct. 844, 850, 83 L.Ed.2d 841 (1985), *quoting, Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980).

■ Death qualification *voir dire* necessarily requires "deep probing as to opinions held," including exploration of whether the venirepersons can consider the full range of punishment under the facts alleged in the case before them. *State v. Leisure,* 749 S.W.2d 366, 373 (Mo. banc). "In determining the qualifications of a prospective juror, the trial court has very wide discretion, and the court's ruling will not be disturbed on appeal unless it is clearly against the evidence and constitutes a clear abuse of discretion." *State v. Hopkins,* 687 S.W.2d 188, 189 (Mo. banc 1985), *citing, State v. Treadway,* 558 S.W.2d 646, 649 (Mo. banc 1977), *cert. denied,* 439 U.S. 838, 99 S.Ct. 124, 58 L.Ed.2d 135 (1978), *rev'd on other grounds, Sours v. State,* 593 S.W.2d 208, 210 (Mo. banc), *vacated,* 446 U.S. 962, 100 S.Ct. 2935, 64 L.Ed.2d 820 (1980). No bright line exists to determine when a potential juror should be excused for cause. Rather, each case must be judged on its own facts. *State v. Draper,* 675 S.W.2d 863, 865 (Mo. banc 1984).

"What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with a definite impression that a prospective juror would be unable to faithfully and impartially apply the law. . . . [T]his is why deference must be paid to the trial judge who sees and hears the juror."

*Witt,* 469 U.S. at 424–26, 105 S.Ct. at 852–54.

■ Appellant contends that the prosecutor should have not been allowed to inquire of venirepersons whether they would be able to sign a punishment verdict of death form if acting as jury foreman. Ap-

pellant claims that a person who can properly consider the death penalty as punishment under the law should not be excluded from a jury because that venireperson would be unable to sign a verdict form. Appellant raises this issue for the first time on appeal. As a consequence, the question will be reviewed for manifest injustice or miscarriage of justice under plain error. *Rule 30.20.*

Appellant relies upon several cases which found reversible error when counsel obtained from prospective jurors a commitment to act in a certain way. *See, e.g., State v. Kelly,* 728 S.W.2d 642, 645 (Mo. App.1987), and cases cited therein. Appellant claims the prosecutor improperly sought a commitment from the venirepersons by phrasing questions in a way such as to require venirepersons to speculate on their own reactions to signing or reading a punishment verdict of death form, thereby causing venirepersons to feel obligated to react in a specific manner. The cases upon which appellant relies are without authority for his point. Requesting a commitment from a prospective juror is not analogous to inquiring whether the venireperson could sign a verdict form. Furthermore, a prosecutor's use of the words "will you be able to," "can you," "could you," and, even, "will you," have been held acceptable on *voir dire. Leisure,* 749 S.W.2d at 373. Words spoken on *voir dire* are not measured alone; the words must be judged in the context and circumstances in which they are heard. *Id.* The record in this case reveals nothing even resembling a request for commitment from venirepersons. Parenthetically, but notably, during the *voir dire* defense counsel asked the identical question of which appellant now complains. Appellant suffered no manifest injustice under *Rule 30.20.*

■ Appellant also claims that the prosecutor wrongly inquired of venirepersons whether they believed the death penalty was a necessary law. This issue is also raised for the first time on appeal and is reviewed under plain error. Appellant shows no manifest injustice. The questions asked by the prosecutor served to

discover the venirepersons' views on the death penalty. In a capital murder case, inquiry into the veniremembers' views regarding the death penalty is of "critical importance to the state, the defendant and the court." *State v. Antwine,* 743 S.W.2d 51, 60 (Mo. banc 1987), *cert. denied,* 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988). Death qualification *voir dire* necessarily permits exploration of whether the venirepersons can consider the full range of punishment under the facts alleged in the case before them. *Leisure,* 749 S.W.2d at 373. It is within the trial court's discretion to permit such inquiry.

■ Again without having preserved the claim of error, appellant complains that the prosecutor asked the veniremembers whether they could set aside any sympathy they might feel for the defendant in reaching their decision. The complaint lacks merit. A jury does have the right to grant mercy, and to impose a life sentence instead of the death penalty, even if aggravating circumstances outweigh mitigating ones. Sympathy, however, is not a proper factor to consider in reaching a decision on punishment because it is more likely to be grounded in extraneous emotional factors. *State v. Clemmons,* 753 S.W.2d 901, 910 (Mo. banc), *cert. denied,* — U.S. —, 109 S.Ct. 380, 102 L.Ed.2d 369 (1988). There is no plain error.

■ Without having preserved the issue for appeal, appellant complains that the prosecutor mislead the panel by his language: "That means all twelve of the jurors who decide the case have to agree to a particular finding. It is a juror's obligation to participate in a discussion and to agree to a unanimous opinion or verdict." Appellant misrepresents by isolating portions of the record. The prosecutor made the comments in the context of explaining the burden of proof and inquiring whether the panel members could participate in a discussion of ideas and confer with other members of the jury in an endeavor to reach a unanimous verdict. To permit this general question to the panel would have been well within the discretion of the trial court, even had the defense objected. Ap-

pellant suffered no manifest injustice under *Rule 30.20*.

■ Appellant claims the trial court abused its discretion in sustaining the state's challenge for cause of venireperson Carol Ryan. Ms. Ryan volunteered in an early stage of *voir dire* that her nephew had been convicted in another state as an accessory to murder for which he received a life sentence; Ms. Ryan stated that she felt that the nephew was wrongfully convicted and had not been treated fairly by the criminal justice system. In addition, Ms. Ryan had in the past accused a local attorney of unethical conduct, indicated that she was suing a second attorney for malpractice, and revealed that she had been married to a police officer for thirteen years. Finally, Ms. Ryan admitted to holding strong reservations about her ability to consider the death penalty as punishment. The trial court sustained a motion to dismiss for cause based upon her contacts with law enforcement and her bitterness toward the criminal justice system, as well as her views on the death penalty.

Appellant contends, and Ms. Ryan intimated under questioning, that her experiences would tend to make her a better, more conscientious juror. The trial court is not compelled, however, to accept the prospective juror's own assessment of her capabilities. Although the record may be open to more than one interpretation, there are situations where the trial court is left with the definite impression that a prospective juror would be unable faithfully and impartially to apply the law. *State v. Walls*, 744 S.W.2d 791, 796 (Mo. banc), *cert. denied*, —— U.S. ——, 109 S.Ct. 181, 102 L.Ed.2d 150 (1988). For this reason, the reviewing court gives deference to a trial judge who sees and hears a prospective juror during *voir dire*. The trial court did not abuse its discretion in excusing Ms. Ryan.

■ Appellant claims abuse of trial court discretion in excusing venirepersons Nancy Hoeman and Barbara Sweet and claims a consequent deprivation of his right to a full panel of qualified jurors. Both women were responsible for the care of young children and were excused on the ground that jury service would impose undue hardship upon them and their children. The trial court is afforded substantial discretion in ruling on discharges for hardship and other grounds. *State v. Murray*, 744 S.W.2d 762, 770–71 (Mo. banc), *cert. denied*, —— U.S. ——, 109 S.Ct. 181, 102 L.Ed.2d 150 (1988). The husbands of both women are physicians who are frequently on call and for whom it was difficult to obtain help with the children on such short notice. In objecting to the dismissal of Ms. Hoeman, defense counsel said only that Hoeman would be a qualified juror "for the week" while her husband was on vacation and asserted that the trial would be over before the following Monday. The judge declined to accept this argument and sustained the motion to excuse Ms. Hoeman. As to Ms. Sweet, counsel initially objected but, after further questioning, stated that he would not object to her exclusion on fair cross-section grounds. The trial court did not abuse its discretion in excusing Ms. Hoeman, and appellant suffered no manifest injustice through the discharge of Ms. Sweet.

■ Appellant next proffers *Witherspoon* challenges. *See, supra, Witherspoon*, 391 U.S. at 522, 88 S.Ct. at 1777. Appellant alleges trial court error through striking five venirepersons: Sifferman, Kessler, Bell, Johnson, and Macer. As stated above, the determination of whether a prospective juror is "death-qualified" is within the wide discretion of the trial judge who is in a superior position to evaluate the demeanor as well as the testimony of prospective jurors. *State v. Smith*, 756 S.W.2d 493, 497 (Mo. banc 1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 823, 102 L.Ed.2d 812 (1989). Appellant concedes that the five venirepersons held reservations about the death penalty but claims that their views would not prevent or substantially impair the performance of their duties as jurors in accordance with the instructions and their oaths.

Appellant again misrepresents by isolating portions of the record with respect to selecting statements by these individuals

favorable to his position while ignoring contrary statements and the venirepersons' testimony as a whole. The question is whether the court could reasonably conclude from the testimony of the venirepersons that their views would prevent or substantially impair the performance of their duties as jurors in accordance with their instructions and oath. *Witt*, 469 U.S. at 424, 105 S.Ct. at 852. As noted, *supra*, there will be situations where the trial judge is left with a definite impression that a prospective juror would be unable faithfully and impartially to apply the law. *Id.* at 425, 105 S.Ct. at 852. *See also Antwine*, 743 S.W.2d at 61.

Here, all five venirepersons were questioned extensively about their beliefs. Their answers to the questions varied depending upon whether the prosecutor or defense counsel posed the question and depending upon how each counsel phrased the questions. At various times during *voir dire*, each of the five equivocated or expressed a reluctance to participate in a death penalty case. Several had additional valid reasons for being excused. Venireperson Johnson's mother had been murdered several years before and she retained strong feelings concerning the murder. Venireperson Bell had a two-year old child and no one else to care for the child. Venireperson Sifferman suffered a hearing impairment. The trial court could reasonably have concluded from the testimony of each of the five venirepersons that their views would prevent or substantially impair the performance of their duties as jurors in accordance with their instruction and oath.

■ Appellant also contends that the trial court abused its discretion by placing limitations on defense counsel's questioning of venirepersons Nageotte and Hines. Counsel attempted to ask reasons for the views on death penalty that Nageotte and Hines revealed during earlier questioning. The prosecutor objected, and the trial court sustained, the claim that these questions exceeded the proper scope of inquiry into what views were held and deviated into an irrelevant philosophical discussion of why the venirepersons held those views. These

were the only two objections made by the prosecutor and sustained by the trial court. Appellant claims that these questions were necessary to rehabilitate Hines and to discover whether Nageotte would automatically vote for the death penalty.

Although wide latitude should be permitted in exploring possible grounds for challenges for cause or peremptory strikes, "the nature and extent of the questions counsel may ask are discretionary with the court." *State v. Smith*, 649 S.W.2d 417, 428 (Mo. banc), *cert. denied*, 464 U.S. 908, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983). The trial court in this case permitted wide latitude for *voir dire* inquiry. After the trial court sustained the objections to counsel's questions of venireperson Nageotte, counsel inquired whether Nageotte could conceive of any serious case in which the death penalty might be appropriate, to which she responded that she could not. It is within the trial court's discretion to exclude "open-ended" *voir dire* questions such as these, particularly when counsel was permitted, in general, fully to probe the nature and strength of the prospective jurors' opinions as in this case.

Appellant's final complaint with respect to the *voir dire* proceeding is that the trial court overruled his motion for individual *voir dire*. Appellant claims that the questioning in panels of six and twelve was inadequate because of extensive pretrial publicity. He claims that any mention of the crime by one venireperson might taint the remaining members of the panel. Appellant further claims that *voir dire* should have been conducted individually for the death-qualification portion of the case.

■ This Court has rejected the claim that individual *voir dire* is necessary in death penalty cases. *Leisure*, 749 S.W.2d at 376; *State v. Gilmore*, 681 S.W.2d 934, 945 (Mo. banc 1984); *State v. Byrd*, 676 S.W.2d 494, 499 (Mo. banc 1984), *cert. denied*, 469 U.S. 1230, 105 S.Ct. 1233, 84 L.Ed.2d 370 (1985). Whether to conduct *voir dire* individually or in small groups is a matter within the control of the trial court and is not a basis for reversal of a conviction absent a showing of both an

abuse of discretion and actual prejudice to the defendant. *Leisure*, 749 S.W.2d at 376.

■ After comprehensive discussion of the question among the court and counsel, the trial court conducted *voir dire* on the subjects of pretrial publicity and death-qualification in groups of six to twelve venirepersons at a time. Where panel members indicated some significant exposure to media accounts of the crime, they were questioned individually out of the hearing of the rest of the panel. As his sole example of a purported abuse of discretion, appellant notes statements by only one venireperson, Rosemary Kessler, regarding what she had heard about the crime on the radio. The statements related exclusively, however, to a few facts subsequently developed at trial, none of which were inadmissible. Further, all members of that particular panel indicated that they would judge the case only from the evidence presented. Counsel made no claim at trial that these remarks were prejudicial, and appellant did not request that the court discharge this particular group of venirepersons. Appellant has shown neither an abuse of discretion nor actual prejudice.

## IV. REMAINING ALLEGATIONS OF ERROR

### A. Plain Error

■ Appellant raises numerous allegations of error unsupported by objections at trial. The review of these unpreserved claims is limited to the standard of plain error. Plain error exists only when the court finds that a manifest injustice or a miscarriage of justice has occurred. *Rule 30.20; State v. Kilgore*, 771 S.W.2d 57, 67 (Mo. banc), *cert. denied*, — U.S. ——, 110 S.Ct. 211, 107 L.Ed.2d 164 (1989).

#### 1.

■ Appellant claims the trial court should not have admitted evidence of appellant's court-martial record and conviction for possession of hashish with the intent to distribute. The state offered evidence of the court-martial during the punishment phase of the trial.

At trial McMillin objected to admission of his court-martial conviction exclusively on the ground that it was not an assaultive conviction. *See* § 565.032.1(3). Appellant abandons that objection and offers other theories not raised at trial or in the motion for new trial. Appellant now relies on *State v. Mitchell*, 659 S.W.2d 4 (Mo.App. 1983), which he claims prohibits the use of court-martial convictions to enhance punishments. *Mitchell* held that the military system of justice is so different from civilian courts that court-martial convictions should not be used to enhance punishment under § 558.016, RSMo 1978 (repealed), the persistent-offender statute. *Id.* at 6. No comparable restriction on the admission of evidence in the punishment phase of a capital trial exists. Punishment phase evidence may include "findings of guilty and admissions of guilt of any crime ... of the defendant." § 565.032.1(3). Further, evidence of aggravating factors is not limited to findings or admissions of guilt by the defendant, but may also include any evidence relating to the defendant's past character and conduct. *State v. Lingar*, 726 S.W.2d 728, 739 (Mo. banc), *cert. denied*, 484 U.S. 872, 108 S.Ct. 206, 98 L.Ed.2d 157 (1987). Furthermore, McMillin's own testimony during the penalty phase included his statement that he "was guilty of the offense so [he] pled guilty."

■ Appellant also contends error, for the first time on appeal, in that the trial court permitted introduction of the entire court-martial record into evidence. The record included reports of the investigating officer and details of a search in which a switch-blade knife was found on McMillin. McMillin compares the court-martial record to a police report which incorporates information obtained from a bystander.

Public records are a recognized exception to the hearsay rule. § 490.220; *see also State v. Hagerman*, 361 Mo. 994, 238 S.W.2d 327 (1951). As required by statute, § 490.220, the court-martial record was provided under seal. Further, the record was submitted to show the existence of the court-martial proceeding and McMillin's conviction, not for the truth of its contents.

Moreover, the trial judge, not the jury, imposed sentence. There was no trial court error and no plain error.

### 2.

Appellant submits the trial court erred in assessing appellant's punishment at death because the court failed to comply with § 565.030.4.

■ Appellant, after stating to the trial court at sentencing that the presentence investigation contained no factual errors, now complains that the trial court's consideration of the presentence investigation created a substantial risk that appellant's death sentence was arbitrarily and capriciously imposed in violation of the Eighth and Fourteenth Amendments of the United States Constitution and Article I, Section 21, of the Missouri Constitution. Specifically, appellant objects to the court's alleged reliance upon a victim impact statement, an interview of McMillin conducted by the probation and parole officer, McMillin's prior arrest records, a summary that detailed disciplinary problems encountered by McMillin during high school, a report prepared by the doctor who conducted a psychological evaluation of McMillin, the probation and parole officer's conclusions about the defendant and the crime, and summaries of interviews conducted out of the presence of defense counsel with McMillin's father and with another punishment phase witness.

Under the authority of *Rule 29.07(a)*, a court may order a presentence investigation in any case. *See also* § 557.026. "The report of the presentence investigation shall contain any prior criminal record of the defendant and such information about his characteristics, his financial condition, his social history, and the circumstances affecting his behavior or may be helpful in imposing sentence or in granting probation or in the correctional treatment of the defendant...." *Rule 29.07(a)(2)*. The court may require that other information be included such as physical and mental examinations of the defendant. *Id.*

■ Only one of appellant's claims in this regard constitutes a colorably valid complaint. Had a jury, rather than the trial court, returned a sentence of death after having been presented with a "victim impact statement," this issue would be governed by *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), and *South Carolina v. Gathers,* —— U.S. ——, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989). The danger of the victim impact evidence is that it may "inflame the jury and divert it from deciding the case on the relevant evidence concerning the crime and the defendant." *Booth v. Maryland,* 482 U.S. at 508, 107 S.Ct. at 2536. The sentence in this case, however, was imposed by the experienced trial judge after ample opportunity to weigh the facts and the law. Where a judge, rather than a jury, is the trier of fact, the reviewing court presumes that inadmissible evidence is not prejudicial. *State v. Mitchell,* 615 S.W.2d 446, 450 (Mo. App.1981), *citing, State v. Leigh,* 580 S.W.2d 536, 545 (Mo.App.1979). The risk of a death sentence being imposed in an arbitrary and capricious manner is greatly reduced when the trial judge decides punishment. *See State v. Clark,* 643 S.W.2d 55, 57 (Mo.App.1982) ("The defendant was also sentenced by the judge because the jury could not agree upon punishment, so there was no prejudice to him."). Appellant suffered no manifest injustice as a result of the presentence investigation reference to the victim impact statement.

■ As for appellant's other contentions in regard to the presentence investigation, reference to two prior arrests of appellant was not prejudicial. In the context of the sentencing phase of the trial, evidence and argument which are not permissible in the guilt phase of a bifurcated trial, including general references to defendant's prior criminal record, are both highly relevant and permissible at the punishment phase. *Antwine,* 743 S.W.2d at 71. The report concerning appellant's high school disciplinary problems is likewise admissible. *Id. Rule 29.07* specifically authorizes the report on appellant's psychological evaluation. Appellant's claim that the personal conclusions imparted by the probation and parole officer in the presentence

investigation and the summary of the interview itself were highly prejudicial and inflammatory is without merit when the trial judge serves as sentencer. Finally, although defense counsel was not present during interviews for the presentence investigation with appellant's father and one of appellant's penalty phase witnesses, appellant suffered no prejudice. Both witnesses, because they were at least potential defense witnesses, were fully accessible to McMillin. Appellant suffered no prejudice causing manifest injustice through provision of the presentence investigation report to the trial judge.

Appellant also contends that the trial judge did not follow the "four-step" process prescribed for capital sentencing by § 565.030.4. The record refutes the allegation; the trial court made an express written finding in which it employed the analysis required by law.

### 3.

Appellant claims abuse of trial court discretion in applying a sequestration order which operated to exclude appellant's father as a mitigation witness. He claims the ruling deprived him of favorable mitigation evidence and violated his right to individualized sentencing as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution.

Prior to trial, appellant invoked the rule on exclusion of witnesses from the courtroom but requested that his parents, who were listed as punishment-phase witnesses, be excepted from the ban. Upon objection by the state, the trial judge asked the defendant if he had authority for allowing such an exception. Counsel stated that he would research the issue for possible renewal later. The court invoked the rule without qualification. "The exclusion or non-exclusion of witnesses is a matter within the sound discretion of the trial court." *Murray*, 744 S.W.2d at 771–72, *citing, State v. Crider*, 419 S.W.2d 13, 14–15 (Mo. 1967).

Appellant did not renew his motion to admit his parents into the courtroom. In the punishment phase of the trial, appel-

lant's mother testified, but his father was not called. Statements by the father, however, appeared in the presentence investigation later ordered at appellant's request. Appellant contends that appellant's father violated the sequestration order and, as a result, was precluded from testifying in mitigation. The record does not support the allegation. First, there is no indication of whether appellant's father was present in the courtroom. Furthermore, appellant's father was not offered as a punishment phase witness. The trial judge, therefore, was never asked to admit or exclude the testimony of the witness. *Cf. Dutton v. Brown*, 812 F.2d 593, 594–95 (10th Cir.), *cert. denied*, 484 U.S. 870, 108 S.Ct. 197, 98 L.Ed.2d 149 (1987), cited by appellant. The trial judge's ruling on the exclusion of witnesses, therefore, was neither erroneous nor prejudicial.

### 4.

Through numerous subpoints, appellant contends that the trial court erred in submitting Instruction No. 23, the punishment-phase instruction on mitigating circumstances. Appellant complains that the trial court erred in not submitting two additional statutory mitigating circumstances so that the jury could consider whether he had no significant history of prior criminal activity, § 565.032.3(1), and whether his capacity to appreciate the criminality of his conduct or to conform to the requirements of law was substantially impaired. § 565.032.3(6). Appellant ignores the fact that he, himself, requested Instruction No. 23. Having done so, he has no cause for complaint. *State v. McIlvoy*, 629 S.W.2d 333, 339 (Mo. banc 1982), *citing, State v. Euell*, 583 S.W.2d 173, 178 (Mo. banc 1979).

### 5.

Although the appellant did not object to the state's closing arguments at either the guilt or penalty phases of the trial nor attempt to preserve allegations of error in the motion for new trial, appellant now claims that thirty-one statements made by the prosecutor were *blatantly* improper. Appellant claims the trial court

erred in failing to declare *sua sponte* a mistrial after the prosecutor allegedly made personal attacks on defense counsel and engaged in personal vouching and improper personalization during the guilt phase. Additionally, appellant claims that the prosecutor made misstatements of law and evidence, argued that certain mitigating circumstances were actually aggravating circumstances and appealed to the jury's passion and prejudice during the penalty-phase. Although this Court has reviewed appellant's other allegations of plain error, under these circumstances, this Court expressly refuses to review appellant's claims with respect to closing argument for the reason that appellant has waived his claim of error by failure to preserve error. "The plain error rule should be used sparingly and does not justify a review of every trial error that has not been properly preserved for appellate review." *State v. Valentine*, 646 S.W.2d 729, 731 (Mo.1983), *citing*, *State v. Davis*, 566 S.W.2d 437, 447 (Mo. banc 1978).

### B. Preserved and Plain Error

#### 1.

▬ Appellant alleges that the admission into evidence of the prior statements of Easley Van Mitchell and Thomas Hawn violated his constitutional rights to due process, to equal protection, and to confront witnesses. Appellant asserts that the statements did not come within the purview of § 491.074, which authorizes admission as substantive evidence of a prior inconsistent statement of any witness testifying in the trial of an offense under Chapters 565, 566, or 568. The statute does not extend to admission of prior consistent statements; those are normally admissible only to rehabilitate a successfully-impeached witness. *State v. Clark*, 711 S.W.2d 928, 933 (Mo. App.1986). Appellant contends that Mitchell's statement was entirely consistent with his trial testimony. Appellant further contends that, although some portions of Hawn's prior statement were inconsistent with his trial testimony, most were consistent and therefore inadmissible. The result of the admission of these two statements,

he claims, was to bolster improperly the testimony of the two witnesses.

▬ When a witness testifies from the stand, the use of duplicative and corroborative extrajudicial statements is substantially restricted. *State v. Seever*, 733 S.W.2d 438, 441 (Mo. banc 1987). Allowing a witness to read prior consistent deposition testimony either before or after he testifies tends to give an unfair advantage to the offering party. *Id.* In some cases, however, a witness' extrajudicial statement is harmless error, when, for example, the statement adds nothing substantial and the witness is available for cross-examination. In matters involving the admission of evidence, the court reviews for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial. *State v. Whitley*, 750 S.W.2d 728, 730 (Mo.App.1988).

▬ Only a small excerpt of Mitchell's statement to the police detective was read into evidence at trial. The statements concerned whether Mitchell remembered taking rope to McMillin at Jerri Pendergrass' apartment. The state claims that the excerpt contained an inconsistent statement in which Mitchell admitted to police that he had taken a length of cord to McMillin in Bryan Nickle's apartment. At trial Mitchell could not recall whether he had taken the cord to McMillin. Appellant argues that there was no prior inconsistent statement because the police asked Mitchell questions during police interrogation different from those asked by the prosecutor at trial.

Even assuming, *arguendo*, that the record could be read to reflect consistent statements, appellant was not prejudiced by the admission of Mitchell's prior statement. First, Mitchell's prior statement is not patently consistent. Moreover, Mitchell was available for cross-examination. Furthermore, even without the prior statements of Mitchell, there was sufficient evidence for a jury to find appellant guilty of Renee Scurlock's murder.

▬ At the time of trial, Thomas Hawn was also charged with the first degree

murder of Renee Scurlock, and no agreement had been made for reduction of charges or leniency in exchange for his testimony. Hawn testified that he had been with appellant and Easley Van Mitchell when appellant made arrangements to meet the victim at the intersection of Sunshine and Glenstone streets, and that he had accompanied appellant to the murder scene and observed the killing from a distance. Although a hair matching Hawn's was found in the victim's automobile, Hawn denied playing any role in the murder of Renee Scurlock. At the close of the direct examination, the state impeached Hawn with a number of inconsistent statements he made in an interview with the police two weeks after the murder. Hawn told the police that McMillin stated, in advance, his intention to abuse or kill the victim; on the stand, Hawn admitted that he made that statement but then testified that it was untrue. On the stand, Hawn substantially changed his testimony regarding whether he had seen the victim's hands tied, whether he had seen McMillin pour gas on the victim, what Hawn had said to McMillin when McMillin came to the car for gasoline, whether Hawn had seen McMillin set the car on fire, and whether Hawn had begged McMillin not to kill the victim. During the police interrogation, Hawn stated that he had seen these events and made these statements; on the stand, Hawn admitted making those statements but then testified that they were untrue.

Subsequent to the testimony by Hawn, the state sought to introduce the tape recording of Hawn's police interview as well as an authenticated transcript of the entire tape. After a lengthy bench conference concerning the effect of *State v. Bowman*, 741 S.W.2d 10 (Mo. banc 1987), *cert. denied*, —— U.S. ——, 109 S.Ct. 83, 102 L.Ed.2d 60 (1988), the trial court admitted the tape and transcript into evidence.

The state does not dispute that § 491.074 authorizes only the admission of a prior inconsistent statement of any witness and that a number of statements in Hawn's police interview were not inconsistent with his trial testimony. The state correctly posits, however, that appellant was not prejudiced through the admission of Hawn's prior statement. Error which may require reversal in a close case may be disregarded as harmless where evidence of guilt is strong. *State v. Whitley*, 750 S.W.2d at 730. Assuming, *arguendo*, that the testimony of Thomas Hawn was improperly bolstered, evidence of McMillin's guilt was otherwise established by strong evidence. McMillin provided detailed accounts of the murder to several of his friends in addition to Hawn: Mitchell, Nickle and Jerri Pendergrass. Physical evidence regarding the condition of the victim and her car substantiated the accounts of the murder McMillin gave to his associates. In the two months before the murder, McMillin made statements to associates indicating McMillin's motive for killing Renee Scurlock. Evidence supports a finding that McMillin obtained the murder weapon and rope to bind the victim in advance. Appellant offered to trade his car for Mitchell's motorcycle because he said the cycle would be cheaper to drive if he had to leave and he commented that "snitches would be dealt with," evidencing his consciousness of guilt. *State v. Rodden*, 728 S.W.2d 212, 219 (Mo. banc 1987).

Appellant relies upon *Seever*, 733 S.W.2d 438. The facts are distinguishable. In *Seever*, the state introduced and played a videotaped statement given by a child who was the victim of a sex crime. The state then called the child herself to testify to the same facts. This Court held that the presentation of the same testimony by the victim in different forms improperly bolstered the credibility of the child witness resulting in an undue advantage to the state. *Id.* at 441. In the present case, the state impeached the credibility of its own witness and, in fact, called attention to his untruthfulness. Furthermore, the prior statement by Thomas Hawn was not only duplicative of his trial account, it was in several instances clearly different and inconsistent, as appellant concedes. Appellant was not prejudiced. *See State v. Ford*, 753 S.W.2d 5 (Mo.App.1988).

For the first time on appeal McMillin raises an equal protection challenge to

§ 491.074. Appellant has waived the point. *State v. Thompson,* 627 S.W.2d 298, 303 (Mo. banc 1982).

### 2.

■ In an argument similar to that concerning the victim impact statement contained in the presentence investigation, *supra,* appellant objects to the admission into evidence of a photograph depicting the victim and her children standing in front of a Christmas tree. Appellant contends that the photograph was irrelevant in that it did not logically tend to support or establish any fact in issue because the victim's identity was undisputed.

The trial court has broad discretion in ruling on the admissibility of evidence where the issue is materiality and relevancy. *State v. Driscoll,* 711 S.W.2d 512, 516 (Mo. banc), *cert. denied,* 479 U.S. 922, 107 S.Ct. 329, 93 L.Ed.2d 301 (1986). The trial court's rulings will not be overruled absent a showing of an abuse of discretion. *State v. Atkins,* 697 S.W.2d 226, 227 (Mo.App. 1985).

There is no basis for disturbing the trial court's ruling. The state claimed the photograph to be the most recent available photograph of Renee Scurlock. The photograph was identified by the victim's mother. The victim's former husband matched the photograph with the burned body which he had identified as Renee Scurlock. Later in the trial, other state's witnesses who had been in the Pendergrass apartment identified Exhibit 1, the photograph, as the woman who had been brought there by appellant. That the victim had two children was established through testimony of more than one witness. Furthermore, the character of Renee Scurlock was not at issue in this trial. On the claim of relevancy, therefore, the trial court did not abuse its discretion in admitting the photograph into evidence.

■ Appellant further asserts that the photograph was extremely prejudicial and violates *Booth,* 482 U.S. 496, 107 S.Ct. 2529. Appellant raises this claim of error for the first time on appeal. This Court, consequently, reviews for plain error resulting in manifest injustice. *Rule 30.20.*

In *Booth,* the United States Supreme Court held that the character of the murder victim is not a legitimate factor in determining the appropriate punishment, and that evidence or argument should not be offered which serves no other purpose than to place such matters before the sentencing jury. *Booth,* 482 U.S. at 502–509, 107 S.Ct. at 2532–2536. *Booth* states that details about the victim may not be offered to the sentencing jury as grounds for imposing a sentence of death. *Booth* acknowledged, however, that information concerning the victim may still be admitted if it is relevant to other matters. *Booth,* 482 U.S. at 507–08 n. 10, 107 S.Ct. 2535 n. 10. The photograph at issue was relevant in proving appellant's guilt for the reasons enumerated above. Unlike the statements objected to in *Booth,* the statements by the prosecutor in this case did not attempt to portray the victim in a favorable light. Instead, he discussed her children and the things the victim would miss as her children grew up. Furthermore, a presumption arises that the trial judge was not improperly influenced by the photograph in imposing sentence. *See, e.g., State v. Young,* 477 S.W.2d 114, 117 (Mo.1972). Appellant suffered no manifest injustice through the admission of state's Exhibit 1.

### 3.

■ Appellant asserts trial court error in denying his motion to compel the prosecution to disclose results of an alleged computer search of arrest records of venirepersons. Appellant states that the prosecution had a "practice" of running a computer search in criminal trials. Appellant claims prejudice in that the state had an unfair advantage because it could use information in questioning venirepersons regarding their prior arrests and in exercising its peremptory strikes on this basis, while the defense must ask prospective jurors about arrests and is bound by their answers.

Only that error which actually prejudices the defendant can lead to reversal. *State*

*v. Kurtz,* 564 S.W.2d 856, 861 (Mo. banc 1978). Neither the defense nor the state asked any venireperson about arrests; therefore, appellant's claim is merely speculative and, thus, without merit.

For the first time on appeal, appellant additionally contends that obtaining the arrest records of prospective jurors violates § 610.100, which provides for closing of official records if a person is arrested and not charged within thirty days. Section 610.120 then enumerates exceptions to the rule. Appellant's standing to assert the rights of venirepersons is doubtful. *See State ex rel. Williams v. Marsh,* 626 S.W.2d 223, 227 (Mo. banc 1982). Without deciding the question of standing, it suffices to rule on this point that appellant suffered no manifest injustice.

4.

Appellant maintains that the trial court erred in admitting into evidence photographs taken of the victim at the crime scene and at the morgue. Appellant claims that any probative value the photographs may have had was outweighed by their prejudicial effect.

The trial court is vested with broad discretion in the admission of photographs, *State v. Guinan,* 665 S.W.2d 325, 331 (Mo. banc 1984), *cert. denied,* 469 U.S. 873, 105 S.Ct. 227, 83 L.Ed.2d 156 (1984), although that decision may be overturned if it constitutes an abuse of discretion. *State v. Kincade,* 677 S.W.2d 361, 366 (Mo.App.1984). Missouri courts have allowed admission into evidence of photographs to corroborate the testimony of a witness, *State v. Davis,* 653 S.W.2d 167, 175 (Mo. banc 1983), to assist a jury better to understand the facts and testimony of witnesses, *State v. Stevens,* 467 S.W.2d 10, 24 (Mo.1971), *cert. denied,* 404 U.S. 994, 92 S.Ct. 531, 30 L.Ed.2d 546 (1971), and to prove an element of the case, *State v. Cutts,* 694 S.W.2d 804, 810 (Mo.App.1985). These standards apply although the photographs may be gruesome. *State v. Murray,* 744 S.W.2d at 772.

Appellant acknowledges the trial court's broad discretion in the admission of photographs but claims that, because he has stipulated to the fact that the victim is dead, the photographs have no probative value. *See State v. Robinson,* 328 S.W.2d 667, 671 (Mo.1959). Appellant's argument fails. The photographs of the crime scene depict details that corroborated testimony of various state's witnesses. Eighteen other photographs depict various stages of the autopsy. The photographs were relevant to the cause of death and to the question of whether the shooting or burning occurred first, as well as to the credibility of Thomas Hawn's testimony regarding appellant's treatment of the victim before her death. The autopsy photographs were also of use in understanding the testimony of the physician who performed the procedure.

Appellant's allegation that the three exhibits that were photographs of the crime scene were cumulative also lacks merit. The credibility of the state's principal witnesses—Mitchell, Jerri Pendergrass, Nickle, and Hawn—was at issue. Accounts of these witnesses with respect to what appellant told them about how he murdered Renee Scurlock were corroborated by the photographs reflecting the condition of the victim and the crime scene.

The probative value of the photographs outweighs any prejudicial effect. The trial court did not abuse its discretion in admitting the photographs into evidence.

5.

Appellant claims that the trial court erred in overruling his motion to quash the information and dismiss on the basis of the unconstitutionality of Missouri's death penalty statute. Appellant contends the statute vests unrestricted discretion in the prosecutor to determine whether to seek the death penalty and thereby creates the risk of arbitrary and capricious imposition of the death penalty in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article 1, Section 21, of the Missouri Constitution. The issue has been raised and addressed by this Court several times. Discretionary acts before the sentencing phase are not relevant to whether

the death penalty is arbitrary and capricious. Only discretionary acts that concern punishment and that occur after conviction for capital murder are relevant to the issue. Consequently, the prosecutor's discretion to prosecute and the jury's discretion to acquit of capital murder are irrelevant. *State v. Trimble,* 638 S.W.2d 726, 737 (Mo. banc 1982), *cert. denied,* 459 U.S. 1188, 103 S.Ct. 838, 74 L.Ed.2d 1031 (1983); *See Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).

■ Appellant also charges that permitting the prosecutor discretion in sentencing violates the separation of powers doctrine by giving the prosecutor authority in an area reserved for the judicial branch. This argument also fails. The United States Supreme Court rejected a similar claim of unconstitutionality based on " 'the opportunities for discretionary action that are inherent in the processing of any murder case' because '[n]othing ... suggests that the decision to afford an individual defendant mercy violates the constitution.' " *State v. Bolder,* 635 S.W.2d 673, 685 (Mo. banc 1982), *cert. denied,* 459 U.S. 1137, 103 S.Ct. 770, 74 L.Ed.2d 983 (1983), *quoting, Gregg,* 428 U.S. at 199, 96 S.Ct. at 2937.

### 6.

■ Appellant asserts the trial court erred in overruling his motion to quash information and dismiss due to the unconstitutionality of Missouri's statutory scheme for the imposition of the death penalty and in sentencing him to death. Appellant seems to contend that proportionality review is of constitutional dimension and that this Court must consider all cases in which a sentence of death was available, not simply cases in which the death penalty has been imposed, in conducting proportionality review. This claim is also without merit. Proportionality review need not include cases such as those in which the state chose not to charge a defendant with capital murder, in which the state agreed to a plea bargain whereby a defendant pled guilty to a lesser charge, where the conviction was for an offense less than capital murder, or where the state waived the

death penalty. *State v. Trimble,* 638 S.W.2d at 737, *citing, State v. Bolder,* 635 S.W.2d at 685.

### 7.

■ Appellant contends that the state failed to comply with the mandate of § 565.005, which requires that the state disclose aggravating circumstances at a reasonable time before commencement of trial. Appellant claims he needed time to "prepare a defense" against the aggravating circumstances.

Eight months before trial, the state provided appellant with a list of the potential witnesses for the state. Twenty-five days before trial, the state notified the defense of the statutory aggravating circumstances it intended to submit in the penalty phase of trial. The state also advised appellant that it did not intend to call any witnesses other than those previously disclosed. Appellant does not claim he was unaware that the prosecutor intended to seek the death penalty; the record in this case would not legitimately permit him to do so. Nor does appellant explain how he would "prepare a defense" against aggravating circumstances. The function of the defense in the penalty phase is to present evidence of the defendant's character and history which might serve in mitigation of punishment. Appellant himself testified and called eight other witnesses in mitigation. Appellant points to no act that he was unable to undertake nor any witness in mitigation whom he was unable to discover or present as a result of having received twenty-five days' notice from the state. There is neither prejudice nor error in this point.

### 8.

After the jury was unable to agree on punishment, the trial court imposed a sentence of death finding three aggravating circumstances, which authorized the court to consider that penalty: that the murder was outrageously or wantonly vile, horrible or inhuman in that it involved torture or depravity of mind, § 565.032.2(7); that the murder was committed while appellant was engaged in the perpetration of a kidnap-

ping, § 565.032.2(11); and that the murder was committed while appellant was engaged in the attempt to perpetrate a felony offense under Chapter 195, § 565.032.2(11). Appellant challenges all three, claiming violation of the Fifth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 21 of the Missouri Constitution.

▆▆ Appellant first contends that the statutory circumstance contained in § 565.032.2(7), which includes torture or depravity of mind, is unconstitutionally vague as applied by this Court in that it does not distinguish among the cases in which the death penalty is imposed from those in which the death penalty is not. Appellant first argues that the death penalty cannot be imposed pursuant to a sentencing procedure that creates a substantial risk that the death penalty will be inflicted arbitrarily and capriciously. *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). Appellant continues by asserting that a sentencer's discretion must be limited to prevent arbitrary and capricious action, *Gregg,* 428 U.S. 153, 96 S.Ct. 2909, therefore clear and objective standards are constitutionally required. *Godfrey v. Georgia,* 446 U.S. 420, 428, 100 S.Ct. 1759, 1764, 64 L.Ed.2d 398 (1980).

In *Maynard v. Cartwright,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), the United States Supreme Court affirmed the Tenth Circuit's holding that the Oklahoma courts had failed to guide sufficiently the sentencer's discretion in applying the "especially heinous, atrocious, or cruel" aggravating circumstance with constitutionally adequate standards. *Id.* 108 S.Ct. at 1859. This Court acknowledged *Maynard* by outlining a "limiting construction" and listing a group of factors, one of which must be found to be supported by the evidence before a finding of depravity of mind can be made. *State v. Smith,* 756 S.W.2d 493, 500–01 (Mo. banc 1988), *quoting, State v. Griffin,* 756 S.W.2d 475, 490 (Mo. banc 1988); *see State v. Preston,* 673 S.W.2d 1, 10–11 (Mo. banc 1984), *cert. denied,* 469 U.S. 893, 105 S.Ct. 269, 83 L.Ed.2d 205 (1984). In *Mercer v. Armontrout,* 864 F.2d 1429, 1435 (8th Cir.1988), the court held that since the Missouri aggravating circumstance combined a finding of depravity of mind with the finding of outrageously or wantonly vile, horrible or inhuman, the aggravating circumstance was sufficiently distinguishable from that found in *Maynard.* The validity of this aggravating circumstance is grounded in the facts of each case. The limiting effect of the *"Preston* factors" is sufficiently definite to provide a principled means to distinguish cases in which the death penalty is imposed from those in which it is not.

Appellant understandably does not contend that the facts surrounding the murder of Renee Scurlock do not support a finding of torture or depravity of mind. Appellant did not merely murder Renee Scurlock; he beat her about the face with a pistol, poured gasoline on her and set her on fire, and then shot her twice. At the time of her death, Renee Scurlock was bound. There is evidence sufficient for the sentencer to believe that the victim experienced physical and psychological torture and experienced a period of time to anticipate and reflect upon her own death, that appellant was brutal in his conduct, and that the victim's body was mutilated. *Griffin,* 756 S.W.2d at 489, *citing Preston,* 673 S.W.2d at 11.

The Eighth Circuit's recent holding in *Newlon v. Armontrout,* 885 F.2d 1328 (8th Cir.1989), does not undermine the holding here, nor does it serve to abrogate the aggravating circumstance "outrageously or wantonly horrible, or inhuman in that it involved depravity of mind." The Eighth Circuit did not declare the statute facially invalid, but, rather, found *Newlon's* sentence to be unconstitutional as a result of the trial court's arbitrary and capricious application of the statute. *Id.* at 1335. During the penalty phase of the *Newlon* trial, the jury asked the court to define "depravity of mind." The trial court replied that it was unable to instruct the jury further. *Id.* at 1334. The Eighth Circuit specifically found that the jury in *Newlon* did not know what the phrase "depravity of mind" meant, and, thereby, could not have sufficiently narrowed the class of persons

eligible for the death penalty. *Id.* Here, the trial court sentenced appellant. On that basis alone the circumstances are distinguishable from those in *Newlon.* This statutory aggravating circumstance is not constitutionally defective as construed in the decisions of this Court and as applied by the trial court to the facts of this case.

■ Appellant also contends, for the first time on appeal, that it was plain error for the trial court to submit two statutory aggravating circumstances under § 565.032.2(11), murder during a kidnapping and murder during the perpetration of the sale of a controlled substance. Appellant interprets the language of the statute to permit only one aggravating circumstance to arise from § 565.032.2(11). Appellant's interpretation is erroneous. The language of the statute does not preclude the submission of two statutory aggravating circumstances where the murder is committed in the perpetration or attempt to perpetrate two separate felonies. The use of the disjunctive "or" cited by appellant indicates that only one such felony is required but does not suggest that no more than one felony may be pleaded or proved. The claim is without merit.

■ Appellant's claim that the state failed to adduce sufficient evidence to support the submission of the aggravating circumstance that the offense was committed during the perpetration of the sale of a controlled substance is likewise without foundation. Before the murder of the victim, appellant demanded that Renee Scurlock either return the money or supply him with drugs he had requested. Appellant's motive for killing Scurlock directly involved the sale of a controlled substance.

■ In conclusion, it serves to recite that a finding of only one aggravating circumstance is sufficient to support the death penalty. *Schlup v. State,* 758 S.W.2d 715, 716 (Mo. banc 1988).

9.

■ Appellant objects to the submission of a portion of Instruction No. 25 that instructed the jury in the penalty-phase as provided in MAI–CR 3rd 313.48:

"If, after due deliberation, you are unable to agree upon the punishment, your foreman will sign the verdict form so stating. In such case, the Court will fix the defendant's punishment at death or at imprisonment for life by the Division of Corrections without eligibility for probation or parole. You will bear in mind, however, that under the law, it is the primary duty and responsibility of the jury to fix the punishment."

Although appellant acknowledges that the language used in Instruction No. 25 was approved by this Court in *State v. Sandles,* 740 S.W.2d 169, 172–74 (Mo. banc 1987), *cert. denied,* 485 U.S. 993, 108 S.Ct. 1303, 99 L.Ed.2d 513 (1988), and *State v. Walls,* 744 S.W.2d at 798, appellant nonetheless requests that these decisions be reconsidered in light of the number of trials conducted since *Sandles* in which the jury has been unable to agree upon punishment. Appellant contends that the language in the instruction leads the sentencing jury to believe that the responsibility for sentencing lies elsewhere, and, thus, violates the Eighth Amendment to the United States Constitution.

Appellant's point rests in his contention that the number of juries unable to agree upon punishment has significantly increased since October 1, 1984, the effective date of the instruction at issue. First, appellant fails to cite this Court to those cases that appellant alleges were cases in which juries were unable to agree upon punishment after October, 1984. Furthermore, instructions advising the jury of the part played by other officials or agencies in capital sentencing have been upheld by the United States Supreme Court, and appellant has no legal right to require a punishment verdict by the jury based upon their misperception of the law. *California v. Ramos,* 463 U.S. 992, 1009, 103 S.Ct. 3446, 3457, 77 L.Ed.2d 1171 (1983).

■ For the first time on appeal, appellant lodges constitutional challenges to the provision that the court, rather than the jury, may impose punishment pursuant

to § 565.030.4. Appellant asserts that § 565.030.4 is unconstitutional for the reason that it creates a risk of arbitrary and capricious imposition of a death sentence. Appellant asserts that, when the jury could not agree upon punishment, the trial court considered numerous arbitrary factors not relevant to the sentencing decision. There is no evidence in the record to support appellant's contention; moreover, as discussed above, the trial court properly followed the four-step process as mandated by § 565.030.4. Appellant's unpreserved contention that § 565.030.4 is fundamentally unfair is also without merit.

## V. INDEPENDENT REVIEW

■ Under § 565.035.3(1), (2) and (3) this Court reviews whether appellant's sentence is excessive and disproportionate to the punishment imposed in similar cases, whether the sentence was imposed under the influence of passion or prejudice, and whether the statutory aggravating circumstances found by the trial court were warranted by the evidence. This Court has compared Missouri cases in which the death penalty was imposed on defendants who engaged in torture and physical abuse of the victim before death. *State v. Grubbs*, 724 S.W.2d 494 (Mo. banc), *cert. denied*, 482 U.S. 931, 107 S.Ct. 3220, 96 L.Ed.2d 707 (1987); *Rodden*, 728 S.W.2d 212; *Lingar*, 726 S.W.2d 728; *Walls*, 744 S.W.2d 791; *State v. Gilmore*, 697 S.W.2d 172 (Mo. banc 1985), *cert. denied*, 476 U.S. 1178, 106 S.Ct. 2906, 90 L.Ed.2d 992 (1986); and *State v. Laws*, 661 S.W.2d 526 (Mo. banc 1983), *cert. denied*, 467 U.S. 1210, 104 S.Ct. 2401, 81 L.Ed.2d 357 (1984). Other cases involving kidnapping have also been compared. *State v. Jones*, 749 S.W.2d 356 (Mo. banc), *cert. denied*, — U.S. —, 109 S.Ct. 186, 102 L.Ed.2d 155 (1988); and *Kilgore*, 771 S.W.2d 57. Those cases are similar; appellant's punishment is the same and is not excessive or disproportionate.

■ There is no evidence in the record to suggest that the punishment imposed by the trial court was imposed under the influence of passion or prejudice.

■ The statutory aggravating circumstances which the trial court found were: that the murder was outrageously or wantonly vile, horrible or inhuman in that it involved torture or depravity of mind, § 565.032.2(7); that the murder was committed while appellant was engaged in the perpetration of kidnapping, § 565.032.2(11); and that the murder was committed while appellant was engaged in the attempt to perpetrate the sale of a controlled substance, § 565.032.2(11). As previously demonstrated, the evidence supported submissions and findings on all three.

The judgment of conviction and sentence to death for murder in the first degree is affirmed.

ROBERTSON, RENDLEN and HIGGINS, JJ., concur.

BILLINGS, J., concurs in separate opinion filed.

ANTHONY P. NUGENT, Special Judge, concurs in separate opinion filed.

BLACKMAR, C.J., concurs in part and dissents in part in separate opinion filed.

HOLSTEIN, J., not participating because not a member of the Court when the case was submitted.

BILLINGS, Judge, concurring.

I concur in the judgment and principal opinion. I write separately to emphasize the flagrant violations of the rules governing appellate review by the various public defenders in this case.

Because appellant has been represented by public defenders since the preliminary hearing, they will be referred to as trial, post-trial, and appeal defenders.

Post-trial defender made an abortive attempt to file an unsigned and non-verified "amended motion" to vacate sentence and judgment. This unauthorized document was filed 12 days *after* appellant filed his motion to withdraw his *pro se* motion. Post-trial defender also filed a request for a mental examination of appellant. The

question immediately arises as to the standing of the post-trial defender to file these pleadings. The *record* fails to reflect any authorization by appellant to post-trial defender to make such filings.

Post-trial defender's "amended motion" consisted of 93 single-spaced pages, alleging more than 230 grounds for relief—mainly ineffective assistance of counsel.

The appeal defender filed briefs of 166 and 23 pages, asserting a host of points and sub-points. Many of the grounds asserted in the "amended motion" have been converted into alleged trial errors in this appeal even though not objected to or mentioned in the motion for new trial, and the theory for objection at trial or in the motion for a new trial changed on appeal. All of these "points" are urged as plain error.

The failure to make timely and proper objection, the failure to note the matter in the motion for a new trial, and holding appellant to the original objection is essential to orderly review. Otherwise, as here, there will be open and notorious sandbagging of the trial courts and a virtual broadside of so-called points and sub-points, all without regard to the rules.

Counsel for death penalty defendants should be held to the same standards as attorneys in all other criminal cases if there is to be an orderly appellate process. This Court should insist the rules be followed and not hesitate to declare points are procedurally barred when they have not been preserved—whether direct appeal or post-conviction appeal. And, plain error review triggered when, and only when, the court concludes "manifest injustice" or "miscarriage of justice" appears.

ANTHONY P. NUGENT, Special Judge, concurring.

I concur in the principal opinion but not without the following reservations.

Unlike the civil law countries, we have a great body of the law of evidence because we have juries. The rules of evidence serve to screen trial jurors from material that would mislead them or inflame their prejudices and passions against an accused. In earlier, less fevered days, the Court declared inadmissible photographs of a murder victim's body, deeming them "extremely obscene, offensive, vulgar, horrid, and repulsive." *State v. Robinson*, 328 S.W.2d 667, 671 (Mo.1959). Since those kinder and gentler days, however, Missouri appellate courts have permitted the continued erosion of the rule of evidence invoked in *Robinson*. As we have done so, the trial courts have become more and more permissive and more and more tolerant of the patent hokum laid on them by prosecutors bent on convictions. In these cases, the patent hokum consists of absurd contentions that gruesome photographs are relevant and necessary to prove allegations about which the defendants make no issue, for example the cause of death, the identity of the victim, the condition of the corpse. Since *Robinson* and *State v. Floyd*, 360 S.W.2d 630 (Mo.1962), the courts have honored any such excuse for admission of gruesome photographs, despite their patent irrelevance and grossly inflammatory and revolting nature. *State v. Leisure*, 772 S.W.2d 674, 681–82 (Mo.App.1989). For example, see *State v. Gardner*, 618 S.W.2d 40, 41 (Mo.1981) (photo of victims' decomposed body held relevant to show the body's location); *State v. Newberry*, 605 S.W.2d 117, 122 (Mo.1980) (photo admissible to prove identity and condition of the corpse, nature and location of the wounds, the cause of death, or to corroborate or refute testimony).

The fact that a gruesome photograph adds nothing to the other evidence, *State v. Giffin*, 640 S.W.2d 128, 132 (Mo.1982), *State v. Engleman*, 634 S.W.2d 466, 475 (Mo.1982), or that the defendant offers to stipulate to the evidence depicted in the photographs, *State v. Cummings*, 607 S.W.2d 685, 688 (Mo.1980), and *State v. Sherrill*, 657 S.W.2d 731, 737 (Mo.App. 1983), makes no difference.

Obviously, by our refusal to adhere to the applicable rule of evidence set out in *Robinson*, we have come to the point where, as Judge Blackmar suggested in dissent in *State v. Leisure*, 749 S.W.2d 366, 385 (Mo. banc 1988), the trial court has unreviewable discretion to admit patently

inflammatory and irrelevant evidence, whether we acknowledge it or not. In the case of any rule of law or evidence, to concede that the trial court has unreviewable discretion is at least unwise if not a question of constitutional dimensions. *See* D. Lewis, *Proof and Prejudice: a Constitutional Challenge to the Treatment of Prejudicial Evidence in Federal Criminal Cases,* 64 Wash.L.Rev. 289 (1989).

I concur in the affirmance of the defendant's conviction because of two facts: the evidence of his guilt without reference to the photographs leaves no doubt at all of his guilt, and the jury as a whole apparently resisted the prosecutions' attempts to inflame them, a rare occurrence. But the evidence of guilt sometimes falls far short of proof this convincing, and jurors undoubtedly can be swayed by gruesome but irrelevant photographs. Therein lies the reason for the old rule. We should in such cases adhere to that rule.

BLACKMAR, Chief Judge, concurring in part and dissenting in part.

I concur in the portion of the judgment which affirms the conviction and sentence in the direct appeal. I believe, however, that the trial judge should not have dismissed the Rule 29.15 motion, and so would remand the case for further proceedings on that motion.

## I. The Direct Appeal

I agree with everything that is said in Parts I, III, IV–A subparts 1, 2, 3, and 4, IV–B (all subparts), and V of the principal opinion. As the opinion points out, most of the errors are not preserved. I see nothing even approaching "plain errors affecting substantial rights" within the meaning of Rule 29.12(b). I have the distinct impression that the defendant received a fair trial, and that he was vigorously defended by competent counsel.

Appellate counsel has fully briefed unpreserved points as though they had been properly preserved. I would not preclude appellate counsel from asserting claims of plain error, but lawyers should realize that plain error will not be found unless something startling appears. *See State v. Stuart,* 456 S.W.2d 19 (Mo. banc 1970), in which the Court found plain error in a juror's improper question, despite my efforts to uphold the conviction. Failure to preserve a point properly for appellate review is a procedural default, so that the appellate court may find that the point has been waived.

The principal opinion declines to deal with points of improper closing argument as plain error. This Court has discretion to omit discussion of unpreserved points. We do not have to treat unpreserved points as though they had been preserved properly. I would make the observation, however, that I find nothing in the closing argument which would support a holding of plain error. There is nothing resembling the situation in *Newlon v. Armontrout,* 885 F.2d 1328 (8th Cir.1989).

## II. The Rule 29.15 Motion

I do not believe that the trial judge acted appropriately in dismissing the Rule 29.15 motion, on the basis of the defendant's notarized request, filed at a time when he was represented by counsel. The record shows the following:

November 15, 1988—Defendant files "Motion to Vacate, Set Aside or Correct the Judgment or Sentence."

December 21, 1988—Appointed counsel for the defendant files "Request for Hearing," "Request for Extension of Time," and "Motion and Application for Change of Judge."

January 5, 1989—The defendant filed "Motion to Withdraw, Motion 29.15," signed and notarized January 3, 1989.

January 17, 1989—Defendant's appointed counsel filed "Motion for Extension of Time to File Amended Motion for Post–Conviction Relief" and also "Amended motion under Rule 29.15."

January 31, 1989—Counsel filed "Suggestions in Opposition to Dismissal" and "Motion for Mental Evaluation."

February 14, 1989—The Court, after hearing counsel, but without hearing or

confronting the defendant, entered an order dismissing the 29.15 motion.

We have consistently held that a defendant has the right to appear in court in person or through counsel, but not both. Defendants not infrequently request permission to dismiss their counsel and to conduct their own defense. It is the invariable practice for the court to conduct an inquiry into these requests, to warn the defendant about the problems of self-representation, and to determine whether the defendant has the capacity to conduct a defense. Requests for joint representation are uniformly rejected, and requests coming during the progress of a trial are frequently rejected. The defendant's bare assertion of a desire for self-representation is not necessarily accepted.

In the appellate courts a defendant who is represented by counsel is not allowed to file a pro se brief. The defendant is required to appear only through counsel. Here counsel was appropriately appointed for the defendant, in accordance with the terms of 29.15, and proceeded with his assignment. Under these circumstances the court should not accept the defendant's pro se filing without further inquiry.

I also believe that it would be the course of wisdom for the court to order a mental examination before accepting the defendant's request to terminate the 29.15 proceeding. The suggestion that cause need be shown before the examination is ordered is circular. One does not know what the examination might show. Courts should freely accept counsel's suggestions for examination in death sentence cases. This will save trouble later. *See Smith v. Armontrout*, 632 F.Supp. 503 (W.D.Mo.1986), affirmed 812 F.2d 1050 (8th Cir.1987).

I would affirm the judgment of conviction but would reverse the dismissal of the 29.15 motion and would remand for further proceedings on that motion.